0955, 17-0956, and 17-0957, consolidated, Lobo IV, LLC, that's all, versus V Land Chicago Canal, LLC, that's all. If the lawyers are going to argue, please approach the bench and introduce yourself to the court. Good morning, Your Honor. Brad Nelson on behalf of the Plaintiff's Appellants. Good morning, Your Honor. Timothy Patner on behalf of Lakeside Bank. Good morning, John Shaw on behalf of U.N. Edwards. Now, we have a problem here in dividing up time, so my suggestion is we'll give the plaintiff here half an hour and two defendants 15 minutes apiece. How does that sound? We were hoping for a little bit more than 15, Your Honor. How much are you looking for? Don't talk crazy now. No, but I will take that advice. How about 20? Okay. Thank you. All right. Very well. All right. Let's proceed. And, Your Honor, I'd like to reserve 10 minutes for rebuttal. Okay. As I said, I'm Brad Nelson representing the Plaintiff's Appellants. With me at the council table is my co-counsel, Jeffrey Marks. And unless the court has a different preference, I would like to start with Lobo's appeal. And specifically, I'd like to start by addressing our appeal of the circuit court's order granting Lakeside Bank a first-priority lien on the Canal and Bloomingdale properties. And I want to emphasize Do you think it's improper segregation? I do, Your Honor. Okay. Let's assume that it's improper conventional segregation. How about equitable segregation? There's no basis for equitable segregation either, Your Honor. Can we go back to that conventional segregation for a minute? You are not contesting that there were other liens that Lakeside paid off, correct? Even after Lobo's filed suit. There was other mortgages on the property, correct? Yes. After Lobo came into the picture, Lakeside came in and paid off the prior construction loans on the property. Okay. And that was $7 million-ish? It was $7 million on one property and $3 million on another-ish. Okay. And so when Lakeside came in and did that under conventional segregation, they stand in the same shoes as that mortgagee, correct? If they're entitled to conventional segregation. That's what the circuit court held. Okay. Yes. So let's go right to the meat of it. Why aren't they entitled to conventional segregation on that? Because a year before they came into the picture, Lobo executed purchase agreements to buy those properties. Right, I got that. Under the law of equitable conversion, at that point, Lobo became the equitable owner of the properties. Is there any case that says that once there's a purchase agreement, but the purchase hasn't transpired as of yet, that conventional segregation is not available to Lakeside? Is there any case that holds that? There's no case that addresses that either way, Your Honor. Okay. The cases have not presented this conflict before of a buyer entitled to equitable conversion and a refinancing mortgagee claiming conventional segregation that hasn't been presented. So is the fact that Lakeside had a purchase agreement the sole fact that takes this out of a conventional segregation? That Lobo had a purchase agreement. Is that the sole fact that you're hinging on that takes it out of conventional segregation? Well, I think that's the principal reason. It gives Lobo the ownership interest in that property. The purchase agreements themselves expressly prohibited the sellers. But the mortgages on that property would have existed whether or not Lobo had that purchase agreement or not, correct? Those mortgages would have existed. So Lakeside just pays off the mortgages which were already existing. I get your argument if we're talking about loans that were taken out in addition to those prior mortgages, the construction loans that they financed or whatever after that. But why can't they stand in the shoes of the same mortgage company that already had that lien? Well, the very first requirement of them being able to invoke conventional segregation is that they have a valid and express agreement that they get a first priority lien on the property. Right. Otherwise they wouldn't do it. Otherwise they're not entitled to conventional segregation or to step into those shoes. At the moment that Lobo executed those purchase agreements, both under the law of equitable conversion and under the terms of the purchase agreements, the sellers had no right to make that agreement with Lakeside. How is Lobo harmed, though? Lobo is harmed. Well, is there any harm? Because whether you pay Lakeside or whether you pay the other bank, there's no harm there that Lobo can accept. Well, there's a lot of harm here. Okay. Tell me how. The first harm is that Lobo bargained for and got an express agreement from the sellers that they could not encumber, convey any interest in, or make any agreement affecting these properties without Lobo's consent. That's the terms of the purchase agreement. So how are they harmed? So they're harmed because Lakeside and V-Land went behind Lobo's back and placed those new mortgages on the property. But if we're just going to the amount that you have conventional subrogation on on those original mortgages, how are they harmed? They're harmed because, secondly, they're harmed because Lakeside came in, not just replacing those construction mortgages. Those construction mortgages matured 12 years ago in 2006. This should have come to a head then in 2006. Twelve years ago, something should have happened to bring this to a head. And Lakeside came in and took out those construction lenders and came in as a hostile lender, really, to Lobo and in bed with V-Land and refinanced the mortgages, but didn't just refinance them. They cross-collateralized them. They extended them now for 13 years, 12 or 13 years. And during that entire time, they've sat back and fought off Lobo's right to purchase the properties along with V-Land. They've been a hostile lender to Lobo the entire time. Lobo had the right from the inception to decide whether those mortgages were to be refinanced, on what terms and by what lender, if at all. And they violated those rights. They took that away. And that was a harm right from the inception. Then over the last 12 years, Lakeside has extended the loans time and time again. They've freed up cash for V-Land to fund this litigation. They've allowed the sellers to divert all of the excess cash flow from those properties and withhold possession from Lobo for these 13 years and take all the cash flow, a million dollars a year in revenue from the properties and control all of that and divert millions of dollars. Did the trial court take all that into consideration? The trial court did not, Judge. The trial court ruled on conventional subrogation. And before we got to trial on Lobo's right to specific performance, it granted Lakeside's motion for summary judgment early in the case, before the rest of the case was tried, before Lobo established that it had a valid contract to purchase and that it was entitled to specific performance. And the court basically dismissed all of our arguments that Lakeside was engaging in this inequitable conduct, wouldn't allow us to proceed with those. They struck those portions of our complaint when we filed it. They struck those affirmative defenses and different judges along the way. We had many in the circuit court, in the chancery court. But the harm to Lobo here is really extreme. Lobo has what is now an $11 million judgment against these sellers and is entitled under the law of abatement. Nobody can test this. I'm so glad you brought up abatement. That was where I was going. Yeah. Okay, so the trial court somehow gives you your judgment in the abatement, but they're only up to the mortgage that Lakeside holds. Is that correct? Correct. They require that we pay off Lakeside's mortgages to the tune of $9 million. So is it your position that V-Land is getting a benefit from that because they're not paying off this judgment? Whatever is between V-Land and Lakeside is between them. Is that your position? Exactly, Your Honor. Okay. In the absence of Lakeside, Lobo would be entitled. Right now our judgment is $11.2 million. We'd be entitled to buy these properties for $800,000 by offsetting our judgment against the purchase price, abating the purchase price. And what is it as the trial court stands? What is your payment amount? The trial court in its final judgment ordered us to pay $9.1 million to Lakeside, pay off the seller's obligations to Lakeside, $9.1 million, and allowed us to abate approximately, what does that come, $2.9 million to get to the $12 million purchase price, and then gave us a judgment for $7 million, which we probably will never be able to collect because the sellers have been rendered insolvent. So we're paying twice. Our judgment's not getting paid because we can't offset it against the purchase price, and we have to pay Lakeside. Pay those mortgages and basically just eat our $11 million judgment, or most of it, which is exceedingly unfair. And as between Lobo and Lakeside, Lakeside went and made loans to these borrowers, got personal guarantees and got title insurance insuring over Lobo's position. Lakeside ought to go and pursue its other remedies, collect against its borrowers, not against us. The purchase agreements do not. Well, what if the segregation was only to the amount of the payoff of the original mortgage? Of the original mortgages? Well, that's what the circuit court ordered, that it was the amount of the original mortgages, the construction mortgages. Okay. So how are you harmed if that's the only part of the segregation? Because, Your Honor, like I said, we've been damaged in these intervening 12 years, we've been damaged to the tune of $11.1 million. And in the absence of Lakeside extending the mortgages and keeping this ball rolling on behalf of the sellers for all those years, we wouldn't have incurred those damages. And because of Lakeside coming in and redoing the entire deal from short-term construction loans that matured 12 years ago to permanent financing that's going on ad infinitum, because of that we've incurred $11 million in damages. And we ought to be able to offset that against the purchase price, and they're standing in the way. And the circuit court allowed them to do that. The circuit court also erred by requiring us to pay those mortgages. Under the purchase agreements, it was the seller's obligation, not Lobo's obligation, to pay off those mortgages. The sellers expressly agreed that the mortgages would be paid and the construction mortgage, the seller would pay the construction mortgages at closing and they would be removed as exceptions to title from the title policy. That's not what happened here. Even under the court's final judgment, the court said that Lobo had to pay Lakeside's judgment, which isn't provided for anywhere in the purchase agreement. It violates our rights under the purchase agreements. And the sellers refused to deliver a title policy removing Lakeside's mortgages as an exception to title. So under the circuit court's order, we had to pay Lakeside's mortgages off and take the properties subject to those same mortgages. That's completely different from what the deal was with the construction mortgages. In 2005, when we were preparing to close on the purchase of the properties in 2005, the sellers expressly agreed that the sellers would pay the construction mortgages and those encumbrances would be removed as exceptions to the title at closing. And Lakeside has refused. Lakeside wants a whole different deal for itself to the extreme detriment of Lobo. They want us to pay their mortgage. They insisted on that. The circuit court gave them that. So you're arguing that the judgment amount that the court gave you was not sufficient? We're arguing that we ought to be able to abate the purchase price by the amount of our judgment, subtract, you know, offset our judgment against the $12 million purchase price and buy the properties for the remaining purchase price and that the abatement ought to operate against the sellers and against Lakeside. The law of equitable conversion fully supports that conclusion. The law says that when a mortgagee comes in and places a lien on property with knowledge of a pending sale contract, the mortgagee is subject to the same equities as the seller. One of those equities is our right to abate the purchase price. Lakeside is subject to those equities. The courts, including the Illinois Supreme Court, have also said that a mortgagee who comes in with knowledge of a pending sale contract is bound by the contract and all of its terms and provisions. That's the Illinois Supreme Court's pronouncement in Kavanaugh. That purchase contract requires the sellers to pay Lakeside, not Lobo. It requires the sellers to remove that encumbrance from the title policy at closing and not that Lobo take the properties subject to that. So the harm by Lakeside coming in and intervening here is really extreme. It's $11 million. It prevents us from our equitable right to abate the purchase prices to the tune of $11 million. And there's, like I said, I think that this is consistent with the law. The first element of that is that they have a valid agreement to get a first priority lien. And under the law of equitable conversion and under these purchase agreements, the sellers had no right to make that agreement with them. They can't establish the very first element. They can't establish that there's no harm to Lobo, as I've just discussed, which is the second reason they're not entitled to conventional subrogation. They actually also were guilty of gross negligence, the third reason they're not entitled to conventional subrogation. They knew they were acting in violation of these purchase agreements, in violation of Lobo's legal and equitable rights, and they knowingly took that risk. That's the definition of gross negligence. And finally, they're not entitled to equitable relief. We all know the maximum one who seeks equity must do equity. But that's not what they did here. Lakeside did not do equity. They came in. They knew that they were violating Lobo's rights under the purchase agreements when they placed their loans. They knew the sellers had no right to engage in those transactions, and they went into them anyway. Their hands were dirty from the very beginning. And then they've acted in the interest of the sellers and in a way that's completely hostile to Lobo ever since and inflicted great harm. Can we go back to the abatement issue for a second? Sure. If you could answer the question. So their argument, from what I understand, is that Lobo's not entitled to abatement because in order to do so, you have to have title, et cetera, that is provided, that is clean and free, right? So their argument is for the abatement to take place, there has to be a deficiency in title and quality on any of the property, right? Yeah, and I think that's just wrong. There's no dispute that, and Judge Mason said from the very beginning, if Lakeside wasn't in the picture, she would have granted us abatement right away. And actually, V-Land hasn't appealed the abatement against V-Land. They know that we're entitled to abatement against V-Land. Everybody knows that. And under equitable conversion, the law provides, as I said, that Lakeside, because it knew about those purchase agreements when it made its loans, Lakeside is subject to the same equities as the sellers. It stands in the shoes of the sellers with respect to these equitable remedies. And the main equitable remedy here that we're seeking is abatement of those purchase prices. And Lakeside is subject to that same abatement under the law. And unless there are other questions on our appeal, I think I'd like to reserve the rest of my time, which I think is another ten minutes or so. Okay. Thank you. May it please the Court. I'd like to get right to the issues that were raised during the questioning of my opposing counsel. What the case law of this State has established is that conventional subrogation, in essence, in effect, is no different than an assignment of the prior mortgages. The Court here has before it an issue of priority of interest in real estate. And there's no question that the time Lobo made these contracts, these purchase contracts, it had actual and constructive notice of these prior construction mortgages. The conventional subrogation simply constitutes the effect of an assignment of those mortgages to my client. So to the extent that those mortgages were repaid, $7 million on Canal, $3.5 million on Bloomingdale, those amounts were deemed prior because they were always prior. Lobo knew they were prior. Lobo has suggested a wide variety of equitable theories to overcome that simple solution to this case. But none of those have any real impact upon that basic conclusion. Okay. Let's say we're going with you on the issue of you taking over the loans that originally, but you asked for more than that. You asked for the ongoing loans that were issued by Lakeside. How do you get to say that those are the first priority? The additional $500,000 or so? Well, yeah, I want to make sure I'm tracking everything. So that is one of the issues. That's our equitable subrogation argument. That isn't based upon. Well, let's talk about that. You want to talk about equitable subrogation, I'm happy to talk about equitable subrogation. That is the case of Detroit Steel versus Hooties. And, in fact, the trial court had no problem with applying that case. That's a less common factual scenario in the state. So there's less case law in it. Is there any? Detroit Steel versus Hooties. That was a case where a mortgagee is coming in and saying, by the way, are there any claims on this property? Yes, there are some material that haven't been paid, but I'm going to repay them. And then in a foreclosure, there's another mechanic leaner who is asserting priority over the mortgage under the Mechanics' Lien Act, Section 16 of the Mechanics' Lien Act. What the court finds is, no, actually, to the extent that you paid off those other material, you have an equal lien to the mechanic leaner, and so you all share equally at that tier. That is equitable subrogation. It's very similar in this context to conventional subrogation. We are paying somebody who has prior liens, or in this case, they were of equal tier to the mechanic leaner. We're repaying somebody and we're taking on that priority because of an express intention to have the same priority as those mechanic leaners. So the trial court didn't reject Detroit Steel in this case. What it said is, oh, well, when you subrogate to those mechanic leaners in this case, those mechanic leaners had lost their rights, or after you paid them off, you didn't do certain things and you lost their rights. So the first argument was that they had waived already. Now, we pointed out in the briefing that under the law of this state, as most recently expressed in court ex sales, waivers of mechanic liens are not enforceable. They don't waive the lien unless payment is made on those waivers in innocent reliance upon those waivers. The courts in this state have recognized that contractors give out, because of the way the payment process works in a construction site, contractors give out waivers all the time in expectation of receiving payment. If they don't receive that payment, the waivers are not enforceable. That was the situation here. Lobo, had we not paid the contractors, and the contractors sought to enforce mechanic liens, those contractors would not have been barred from enforcing their liens against Lobo's interest as a subsequent purchaser because of those waivers. Lobo didn't pay anything on those. They didn't rely on those. So under court ex sales, those waivers would be a nullity as to Lobo, and consequently, they're not a defense here. The other feature of the trial court's decision was perfection. And the trial court had to engage, because it was on summary judgment, the trial court had to engage arguendo in the assumption of certain facts. And the fact that the trial court engaged in it was that the last day to work was 45 days prior to the payment by Lakeside to the contractor. So at the time that those mechanic lieners were repaid, the four-month period for Section 7, perfection, had not yet expired. As we pointed out in the briefing, once that payment is made, there are impediments to us engaging in those mechanic lien perfection requirements. We would have to file a certain claim under oath. We would have to file a lawsuit and make certain allegations, which once they're repaid are impossible to make. So what we argued to the court in our briefs was equity should be performed, what could have been performed at the time, because perfection could have been still done at the time of the refinancing. We should not be denied equitable subrogation to those mechanical lieners, simply because the form changed. Lobo points out you could have taken an assignment and then perfected it. That's actually support to our position. Yes, we could have taken an assignment and perfected it. Equity should deem done what could have been done at that time. It was impossible for us to do it. The court should not deny us equitable subrogation simply because the form of the debt changed to a mortgage. We couldn't foreclose a mortgage or file a Section 7 requirement once we refinanced it. But Lobo makes an agreement, I mean, an argument as to the conventional subrogation, saying that the case law shows that you have to have a subrogation agreement, an express agreement to have conventional subrogation. Do you have a case that says otherwise? We established as a matter of undisputed fact in the trial court that we had such an agreement with VLIN. All that's required is that there be an intention to provide a limit. Do you have a written agreement? I didn't find one in the records. The only thing I found in the record was a document that the bank filed that said that they were subrogated. They emailed. If Your Honor looks carefully at the law in terms of home federal savings, Beerstadt, this Court's decision in LaSalle, the Ames Capital case from the Second District, a very significant case, it does not require a written agreement. In fact, the existence of an agreement can be implied from the circumstances. One of the cases that we cited, and I forget if it was Union Bank or Union Planters Bank, inferred the agreement from the fact that the new mortgage, the refinancing mortgage, was recorded at the same time as the lien, the prior mortgages were released, indicating that intention. What we established in this case was the loan documents, the resolutions of the borrower, the underwriting documents, the application, all expressed uniformly without a doubt an intention on VLIN's behalf to give Lakeside a first mortgage lien. And that would be in substitution of the construction mortgages that were being repaid. So that element really wasn't at issue in the trial court. What Lobo is arguing here, one of the arguments that it makes, and I think they established that it was their principal reason, is this concept of equitable conversion. And I'd like to take a moment and really focus in on this because I think it's significant. We think that this court's opinion in LaSalle Bank gives an indication to the court that equitable conversion does not invalidate, or trump, if you will, conventional subrogation. We argue in the briefs that that's because the equitable conversion does not invalidate the subsequently provided mortgage. We actually look at Lobo's own cases, including the Hinsdale case, United Community Bank, to show that even once the purchase contract is put in place, the seller of that contract still has real property interests and the ability to deal validly with the property. I believe it was the Hinsdale case that said... Okay, so if VLIN has that authority to deal with the property, take out any mortgages on the property that they want, why is Lobo not entitled to abatement against any of the purchase price of that property?  Abatement, the cases that describe abatement, that is a way of remedying a breach of contract between the parties to that contract, between Lobo and VLIN. It comes out of specific performance case law that says that if there's a delay in the closing, there could be equitable adjustments, there could be equitable compensation to make up the difference. But it arises strictly out of the contract between the buyer and the seller. So what the trial court here said was, well, we can abate the purchase price all day long with respect to VLIN, but there's a prior lien interest on the property. That prior lien interest can't be affected by abatement. The construction mortgages, suppose they've never been refinanced, then there had been a closing and there had been some abatement. Construction mortgages can't be affected. They say, well, you can do whatever you want among yourselves, but I have a prior lien here I'm not releasing until I'm paid off in full, and nobody can require me to release it because it's prior, it's a prior interest on the property. Conventional subrogation just puts us in that same prior position to the extent that we've paid it off. Abatement can't affect that prior interest. So your position is, and correct me if I'm wrong, that VLIN can contract with Lakeside Bank all day long. They can make whatever encumbrances on this property that they want to, and even though they have a purchase agreement that precluded them from doing that, Lakeside Bank still gets paid no matter what VLIN did. Is that your position? I think that is – Is that simplistic? That goes further than we go. Okay. So what we say is because conventional subrogation and substance is merely an assignment, to the extent that we repay those other mortgages, equitable conversion has no impact on that, and neither do the consent provisions of the contract. This court itself said in LaSalle Bank, consent is not an element. Consent of the intervening party is not an element of conventional subrogation. So it's cited to a case called Arnott. How about clean hands? Is clean hands an element? Clean hands would be an affirmative defense to an equitable cause of action. The unclean hands defense was eliminated – I'm sorry, it was dismissed on the pleadings below. There's a dispute between the parties as to whether it was effectively appeal here. We think what Lobo is doing is arguing a broader sort of balancing of the equities that's unmoored from unclean hands. But unclean hands has to be fraud or bad faith directed to the defendant in the transaction complained of. As the trial court correctly pointed out, we have no transaction with Lobo. We have never dealt with Lobo. We have never engaged in fraud or bad faith directed to Lobo in any transaction. You were aware of the agreement to purchase the property. Weren't you aware of the provisions of that agreement? We were, Your Honor. And that is a matter of notice. We had actual notice of the intervening interest, but as conventional subrogation jurisprudence indicates, notice is irrelevant. Lobo had notice of the construction mortgage. All we're doing is taking their place in the same manner as an assignment. The construction mortgagees could have freely assigned their mortgage to anybody they wanted to without any consent from Lobo. They could have decided to extend the term without any consent from Lobo because they're a prior interest. All we're doing is saying to the extent that we paid them off, we are prior and we have the same rights. Lobo's harm, by the way, I just want to touch on this for a second. The primary harm here that they complain of is cash flow, excess cash flow from the properties that went out over a period of years. Frankly, Your Honor, Your Honors, the cash flow could – Lobo could have engaged in ancillary remedies here to prevent that harm to itself. Well, wasn't their filing suit immediately on December 22nd when the closing didn't happen on the 15th a pretty strong indication that they were trying to limit the harm to themselves? Well, but they did not seek ancillary remedies with respect to the cash flow. They did not seek an injunction against distribution of the cash flow. I thought they had sought a turnover order of all the rents. They had sought a turnover order of the rents. I'm not aware of any such order in the case. Two and a half years after the commencement of the case, they did go to Judge Epstein and ask for a receiver. Judge Epstein denied that motion. There was no appeal from that motion. Judge Epstein denied that motion in part because he was saying, I don't think there's an emergency and I intend to try this case soon. If you look at the transcript. How did that go? Sorry? How did that intention go 15 years later? We weren't even in the case at the time, Your Honor. So the reasons why that case didn't get tried right away by Judge Epstein is we weren't in the case, so we weren't part of that. But had Lobo sought ancillary remedies, they would have been able to protect themselves in a way. Now, what the trial court said was, okay, fine, but, you know, something. Lakeside did not itself have any duty to Lobo to do anything with those excess cash. Again, the construction mortgages as a prior lien, had they not been refinanced, would have had no duty to Lobo to do anything with respect to that excess cash. They've never cited any case that says there's any duty or that it's inequitable in any sense. Your argument seems to be heads are win, tails are lose. It seems like your argument is you could contract anything you wanted with VLAN, and even though there are these purchase agreements, it's irrelevant to what Lakeside did. Well, again, I don't think we go that far. I think we just not anything we wanted, Your Honor. To the extent that we are repaying the prior mortgages, we have the position of priority, and none of these harms were the result of anything about that priority. We did suffer in the trial court a judgment that to the extent that we funded more, we did not have priority, and we would be subordinate, and we were not to be repaid that amount. Now, we're trying to get some of that back, the $518,000 that was paid to the contractors, two smaller payments of approximately $70,000 each for property taxes that were paid, and some of the money from the Connell loan actually went over to the Bloomingdale closing to help repay the construction mortgage on the Bloomingdale. There wasn't enough money in that loan to repay the construction loan on Bloomingdale. So that's the subject of the cross appeal. But we're not saying they can just contract to do anything, but we're saying that to the extent that all we're doing is substituting for that prior mortgage, Veland can contract, and Veland can do that. And if it is a breach, and I think we point out in the footnote, if you read the language closely in the provisions, it's not a breach, because there's no change in position under conventional subrogation. It's just like an assignment. An assignment would not be a breach of those provisions. But even if there is some sort of breach of provision there, Your Honor, that doesn't invalidate the mortgage, as the Hinsdale case pointed out. Hinsdale was not a conventional subrogation case. It was a case where purchase contracts put in place, then the seller obtains a mortgage on the property. You know, you're running past your time. You're quite familiar with some of these cases you're talking about. They may not be relevant as to this case, but you're way past your time. Thank you for your kind attention and the extra time, Your Honor. Good morning. May it please the Court. Again, my name is John Scheid, and I represent the VLAND entities. Your Honors, from VLAND's perspective, there are two main points that I wanted to communicate today. The first point is that the award of specific performance was properly ended by Judge Valderrama in March of 2017. And the other point I want to communicate is that the damage award by the trial court in 2012 was incorrect. And I'm going to begin quickly with the second point in response to something that Mr. Nelson had said a moment ago. He had argued in an answer to a question from the Court that there is no argument that abatement is warranted here. There is an argument that abatement isn't warranted at all. We argue that there should be no damages. We argue that, strictly on contract interpretation, that Lobo never brought forth the correct appraiser. And since the incorrect appraiser... Was there a limitation in the purchase agreement about who could? It was just the primary lender was to give the appraisal. Is that correct? Yes. Was there any high-low agreement in the purchase agreement? Anything that says, you know, if it's $200,000 over or $200,000 below, we're good. But anything other than that? Justice Burke, you're correct. There were three elements to the way it was written. Before Lobo could engage the price adjustment, they had to come forth with a permanent lender who had a loan commitment. And what's critical about those provisions is that the loan commitment from the permanent lender had to involve an appraiser from a loan commitment associated with a non-recourse loan. But let me ask you a question directly. There was no high-low. There could have been. There was not. There could have been. And so doesn't VLAND kind of have to live with the terms of that? So the appraisal comes in, it's a million dollars less on one property, $300,000 less on the other, or whatever that was. And VLAND is kind of stuck with that. And VLAND says, oh, no, no, no, we just won't close on this thing. The only difference between what Your Honor just said is that we quarrel with and we disagree with the fact that they didn't have the correct appraiser. They were supposed to engage an appraiser of a certain type of quality, a certain type of – Is that what the agreement said? Yes, it does, Your Honor. A certain type of quality? Yes, it does, Judge. It has to be an appraiser who would be hired by a permanent lender who would only offer a non-recourse loan. And if I may, I'd like to explain why that's relevant. Why it's relevant is because in the regular course, in contrast, let's talk about a residential mortgage. Well, wasn't your argument in your brief that this was not a permanent lender? Isn't that your argument? Our argument, it wasn't a permanent lender because there was no non-recourse loan associated with a loan commitment. I'm sorry to interrupt, but is that your definition of what a permanent lender is? Yes, Your Honor. It's a combination of the two things. So we have in Paragraph 3 and we have in Paragraph 8. The definition of permanent lender is as follows. In Section 3, Paragraph 3, it provides that the party shall obtain a certified copy of a permanent lender as defined below appraisal. Below Paragraph 8, it defines permanent lender as one who provides a loan commitment and then, this is the third part, it states that for a loan commitment, quote, the loan commitment shall provide for a non-recourse loan in an amount equal to 80% of the purchase price. And because there was no loan commitment here, the appraisal wasn't from a permanent lender? Correct. It wasn't the correct appraisal. The reason why these parties required that there be a loan commitment from a non-recourse lender is because it would require, it would force a lender. Non-recourse loan obviously being one where there's no individual liability. With less security, a lender therefore has to make sure the appraisal is more accurate. They're much more careful when there's a non-recourse loan as opposed to when there's individual liability in addition to the properties themselves. And in this situation, we have tenants, we have leases, we have capitalization rates. All of those elements should have been included and they would have been if there had been the correct appraiser and the correct non-recourse loan. That's our point with regard to the appraisal. Because Lobo disregarded all of that, went out and hired any appraiser he wanted to, lo and behold, they came back with an appraisal that happened to be $1.7 million less. That's why the land didn't close. It didn't close out of spite. It didn't close because Lobo didn't live up to the contract. That's our purpose or that's our argument with regard to the beginning. Regarding the appraisal, I mean, you can get three different appraisers and they'll come back with three different appraisers. Yes. So what's the point really in terms of whether or not it should be from a lender? That could have been another device. That could have been another procedure that was written into these contracts. It wasn't. What we're left with is this procedure. It's a procedure whereby it'd be a specific, more careful appraiser that would be hired by a lender who had more skin in the game, if you will. That's not what happened here. It was an old second bank. They got an appraiser who came forth and, lo and behold, had, again, an appraiser with $1.7 million left. In cross-examination, we're not arguing this here, Your Honor, but in cross-examination, Mr. Kling testified that he made all sorts of different mistakes. He didn't get the square footage right. He didn't get the lease right. He didn't get the fact that taxes were to be paid, triple net lease as opposed to other. All of these factors played into his analysis, which dropped the price $1.7 million. Had those elements been properly accounted for by the right appraiser, we argue, we wouldn't be here now. Did the appraiser testify to that? He did testify to that. In a cross-examination, he admitted the fact that he had the square footage wrong, for example, and a number of other elements as well. But did anyone ask him whether his appraisal would have been different? In considering those things? I don't know the answer to that, Your Honor. I do. I don't think he did. Square footage. This is an evidentiary matter. That is an evidentiary matter. And what we're arguing here is not an evidentiary matter. We're arguing that, based strictly on Paragraph 3 and Paragraph 8 and the contract interpretation principles, so therefore in a de novo review than anything else, this is the wrong appraiser. He landed in breach. So with regard to damages, that's our first point. We never breached in the first instance. But the second point. Not to interrupt you again, but isn't really the harm here to Lobo not to B-Land with regards to the appraisal? Well, no. And here's why, Judge. They would have received a benefit of $1.7 million. So the purchase price of $13.7 million. Mr. Kling said, I disagree. I think the price should be $12 million for these two pieces of property. That most certainly would have benefited Lobo and most certainly have hurt B-Land in that situation. Does that answer your question? Yes. What's your position on B-Land's or Lobo's right to evade the judgment against B-Land? If I may get there in two points. The first point, they have no right to evade because they shouldn't have any damages because we didn't breach. Second, even if we had breached, Section 16 of the contract limits damages. We argue, again, based on basic contract interpretation principles, there's a limitation of damages provision that limited B-Land's damages to $100,000. So, again, in answer to your question, because of that, there should be no evasion. And then lastly, we argue that since B-Land never closed in March of 2017. So, some parts of the purchase agreement you're all for and some of them you are not for at all, like the appraisal part. So, let's enforce the ones you want and forget about those ones. Respectfully judge, it's the opposite. We believe that Lobo wants to put forth only certain provisions and ignore others. Our point is that we don't need to really worry about the appraisal provision, but we like some of the other provisions. We don't like the limitation of damages provisions, but we do like some of the other provisions. And then with regard to closing in March of 2017 when they refused to close, they said, well, there's some additional conditions we'd like you to satisfy. Those elements, those words are not in the contract, but we'd like you to consider those as well. From our position, we said live by the contract or not. We did live by the contract. It was the wrong appraisal. Well, what about all the encumbrances that were placed on the title insurance the day of closing? That was not B-Land. That instead was the title insurance company saying as follows. I see there's some litigation. I'm concerned. I'm not going to give a title commitment. And then in response to that, Counselor Falobo said, would you mind waiving all your rights? Our response to that was no thank you. Maybe you should dismiss your case. Not to be flip about it, but that's one of the things we argued to Judge Valderrama. So in answer to your question, Your Honor, we didn't add these additional encumbrances. Those encumbrances are not within the contract itself. So in the end, we argue that Judge Valderrama appropriately, and this is the last element to your abatement question, Your Honor. There should also be no abatement because Judge Valderrama made the determination that specific performance is over. They had an opportunity at the latest in 2012 after the trial judge gave them the award of specific performance to close. They did not. Every month thereafter throughout 2012, 2013, 2014 and 2015, there was no closing. We filed a motion to end specific performance in 2015 before Judge Valderrama and that was denied. They still didn't close in 2016. Finally, by 2017, there was a final order. All the parties drafted, submitted to Judge Valderrama. He said, you got to close. You got to close by March 23. That didn't happen. There was an emergency motion that came after that. March 27, Judge Valderrama took extensive argument from counsel and he said, as we quoted in our papers, in the words of Mr. Scheid, either you buy the property, you take it, or you walk away from it. It's got to end. It simply has to end. That's Record Cite 1774. So did Judge Valderrama take into consideration these 12-hour, 12th-hour incumbences that were all of a sudden brought up to the closing? Yes, Your Honor. He did. What was Judge Valderrama's position on that? Well, Judge Valderrama's position is one of the things that we had argued, is that Section 5 of the contract, again, living by the contract, Section 5 of the contract provided as follows. If the buyer had incumbences that it didn't like, it had two options. It could either accept them or it could walk away. And it didn't accept them and close, so Judge Valderrama said, I agree. Section 5 operates, and it's over. Well, in conclusion, I see my time is almost up. Our position is that, first and foremost, that this Court affirmed Judge Valderrama's ruling in March of 2017 that ends the decree of specific performance. And further, we argue that the trial court erred in awarding damages against felon in the first instance. Thank you. Rebuttal? Yes. One point I want to make about the prior construction mortgages, and it is a point that comes from one of the cases we cite, the life savings case. The mortgagee in that case made sort of a similar argument that because there was a contract that, because the purchase contract, you know, mentioned these mortgages that the buyer should therefore be saddled with them. And the court in life savings said, just because the contract mentions some mortgages, it doesn't mean that the buyer is obligated to pay them off unless the buyer expressly agrees to do so. Here, again, it was the seller's, it was VLAN's obligations all along to pay those construction mortgages at closing and have them removed. And it was not Lobo's obligation. Lakeside claims to step into those shoes, but Lakeside wants all of these additional rights. It wants Lobo to pay its mortgage, not the seller's. Lobo to, you know, assume that obligation, not the seller's, even though the seller's had agreed all along that they were going to pay the construction mortgages, not Lobo. And so Lakeside is not merely seeking to just step into those shoes. It's seeking, you know, all these additional rights to which it's not entitled to. And they did it at the March 23rd closing. Lakeside, you know, and the sellers refused to deliver a clean title policy. Mr. Chai tries to blame that on Chicago Title. But Chicago Title actually is on the hook here because they insured Lakeside's mortgages.  So they had a vested interest in not seeing this close as well because they, because Lakeside, you know, was taking a partial payment but not a complete payment. And Chicago Title stood to lose something like $600,000 or more. Well, what about the issue that, you know, they want to make sure that they give a clean title, right? So if these encumbrances are out there, you're not going to have a clean title. So isn't that really what their role is in this transaction? Chicago Title? Yes. Well, regardless of what their role is, it was the seller's obligation under the purchase agreements to deliver a clean title at close. And the argument that Lobo's only, if they didn't deliver a clean title, if all they would deliver is a title subject to Lakeside's mortgages, Lobo's only option at that point was either to close, to pay the mortgages and take the property subject to those same mortgages or just walk away from all of it, walk away from all their rights to specific performance. It's just, I think it borders on the ridiculous. That's not. Isn't that what Judge Valderrama ultimately said, though? It is what Judge Valderrama ultimately said. And that's why we're here on appeal. And Judge Valderrama did not terminate our right to specific performance. Basically, he said, you know, I've tried my best. Go talk to the guys upstairs and go to the appellate court. And, you know, he said it didn't close. And, you know, the case had been pending for 13 years at that point. He thought it was time for us to come up here. And you have to go back to the original agreement, the purchase agreement, required the sellers to deliver title subject only to permitted encumbrances. And the sellers agreed at that time that they would pay off the construction mortgages at closing. And the construction mortgages were not permitted encumbrances that could be, you know, remain as encumbrances on the title at closing. And, again, Lakeside, you know, says it wants to step into those shoes, but it's not willing to live with those consequences. With respect to the Lakeside's position that they had a valid agreement, Mr. Patenote, you know, agreed that or contended that they had an agreement with V-Land. As we know, under the purchase agreements and under the law of equitable conversion, V-Land had no power to make that agreement, no authority to make that agreement. And it's very much like in the LaSalle case, this court, you know, there was a purchase agreement with the contract buyer in that case who was claiming equitable conversion. The problem was that the contract was signed on behalf of the seller by the beneficiary of the land trust. And the court in LaSalle, like the courts have in other cases, said, the beneficiary of a land trust has just a personal property interest in the land and no power to convey an interest in the land, and said, therefore, Mr. Lopez did not have a valid purchase agreement and was not entitled to invoke equitable conversion. The same is true here. V-Land had, because of equitable conversion, when we signed those purchase agreements, V-Land had a mere personal property interest in the properties, had no power or authority to convey an interest in the land, had no power or authority to give Lakeside a mortgage. Lakeside's response that, you know, the construction lenders could have assigned their mortgages to Lakeside is beside the point. That's not what happened. Had the construction mortgagees tried to assign those mortgages, it would have depended on the terms of those mortgages. We don't know if they were assignable. We don't know if they required consent or by whom. But that's not what happened here. The fact that they could have done that is beside the point. And Mr. Petnick's contention that Lobo did not seek ancillary relief to try to control the cash flow from these properties is just plain wrong. As he said moments after he said that, you know, we did seek a receiver. We sought a receiver early in the case from Judge Epstein. He turned it down on the theory that if they were diverting cash flow, we could recover it at the end of the day. But under the circuit court's orders, we're not able to do that. And partly, and in large part, that's because the cash flow has all been diverted. The sellers have been rendered insolvent. And Lakeside has allowed that to happen. We also filed motions to escrow the rents. We filed subsequent motions to seek a receiver. Those motions were denied. Mr. Scheid's arguments about a permanent lender and those definitions, I think, run afoul of the actual definitions in the purchase agreements. In Section 8 defines permanent lender. And it says, buyer's obligations are contingent upon buyer within 90 days after the effective date, entering into a loan commitment with a lender, the permanent lender, prepared to provide permanent mortgage financing for the property. That's all it says. It doesn't say that the permanent lender has to be making an unsecured loan on any particular terms or anything else. It defines permanent lender as a lender prepared to provide permanent financing. Old Second Bank, Lobo's lender, was a permanent lender under that definition. Contrary to Mr. Scheid's comments, Lobo did not go out and hire just any appraiser. The permanent lender did. Old Second Bank hired the appraiser as they were required and permitted to do under the purchase agreements. As your Honor said, they could have easily, if they wanted to guard against mistakes in the appraisal, they could have done what people do all the time. They could have said there's a high-low. They could have said they get the right to hire a second appraiser or the two appraisers hire a third or any of those kinds of provisions to guard against mistakes in the appraisal. There's nothing in the contract that allows them to void the entire contract because of alleged mistakes in the appraisal. And nor is there anything that the court found that there was absolutely no evidence that some other kind of appraisal, appraiser, Mr. Scheid talks about a more quality appraiser. There was no evidence at trial, and Judge Mason found that there was no evidence whatsoever that some other appraiser using some other loan terms as an assumption would have come to any different conclusion than the appraiser that Old Second hired. All right. VLAN's arguments about what Mr. Scheid called a limitation of damages provision in the contract is not a limitation of damages provision. And if you look at the contract, what they've argued in their briefs is that the remedies provided in the purchase agreements for a breach by the seller, LOBO's remedies for a breach by the seller are the exclusive remedies. The law is clear that to have exclusive remedies it has to say so, and in that same provision, paragraph 16A has the remedies for the buyer's breach, LOBO's breach, and it lists some remedies and it says, these shall be the seller's sole and exclusive remedies for LOBO's breach. The next section, 16B, provides for LOBO's remedies in the event of the seller's breach. There's no such provision that says that LOBO's remedies are its sole and exclusive remedies. It's clear if these are sophisticated parties, highly negotiated contracts with sophisticated lawyers on both sides, if they wanted LOBO's remedies to be exclusive, they clearly would have said so in the same manner that they did with respect to the seller's remedies. And with that, Your Honors, I think that's all I have. If there's no further questions. Thank you very much for your consideration. Thank you very much. I want to tell you, gentlemen, that this was a very interesting case, and they had numerous issues, and I hope we gave you enough time to explain that to us, and we're happy with the briefs and your arguments, and shortly we will enter in order. Thank you.